# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge William J. Martínez

Civil Action No. 16-cv-0629-WJM-MEH

THE ESTATE OF JOHN PATRICK WALTER,
by and through its personal representative, DESIREE' Y. KLODNICKI,

      Plaintiff,

v.

CORRECTIONAL HEALTHCARE COMPANIES, INC.;
CORRECT CARE SOLUTIONS, LLC;
CORRECTIONAL HEALTHCARE PHYSICIANS, P.C.;
CHC COMPANIES, INC.;
THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF FREMONT;
JAMES BEICKER, individually and in his official capacity as Fremont County Sheriff;
TY MARTIN, individually;
RAYMOND HERR, M.D., individually;
THE ESTATE OF ROY D. HAVENS, by and through its personal representative, Linda Havens;
STEPHANIE REPSHIRE, LPN, individually;
KATHLEEN MAESTAS, LPN, individually;
SHARON ALLEN, M.D., individually;
JOHN RANKIN, individually;
CARRIE HAMMEL, individually;
MICHAEL GIRTEN, individually;
MICHAEL ULRICH, individually;
ROBERT MILLER, individually;
JUSTIN GREEN, individually;
GREG OWEN, individually;
DUSTIN MAAS, individually;
RICHARD SALANO, individually;
BILLIE BELL, individually;
ANTHONY TURNER, individually;
BALEY SANDEFUR, individually;
ELOYSA TRUJILLO, individually;
LILA CLEMMERSON, individually;
BRAXTON BUFFINGTON, individually;
CHARLENE COMBS, individually;
JORDAN PENN, individually;
SARA LIGHTCAP, individually;
DAVID GREEN, individually;
JOSHUA POHL, individually;

MACKENZIE ROQUEMORE, individually;
ASHLEY RAMEY, individually;
RANDALL CULLEN, individually;
PERRY BURFORD, individually;
CAMERON GONZALES, individually;
LEE COOK, individually;
JAMES WHEATON, individually;
JOHN DOES 1–10, individually;
JANE DOES 1–10, individually; and
DOE CORPORATIONS 1–10,

     Defendants.

---

## ORDER DENYING MOTIONS TO DISMISS

---

By way of 42 U.S.C. § 1983, this lawsuit alleges that John Patrick Walter ("Walter") received unconstitutionally deficient medical care while in pretrial detention in Fremont County, Colorado, eventually causing his death. The Estate of Walter through its personal representative ("the Walter Estate") therefore sues numerous individuals and entities that are allegedly responsible for Walter's death in some way.

Currently before the Court are two motions to dismiss challenging the Walter Estate's Second Amended Complaint ("Complaint"). (ECF No. 84.) The first motion to dismiss is brought by Defendants Correctional Healthcare Companies, Correctional Care Solutions, Correctional Healthcare Physicians, and CHC Companies (collectively, "CHC"). (ECF No. 92.) The second motion is brought by Defendant Estate of Roy D. Havens through its personal representative ("the Havens Estate"). (ECF No. 114.) For the reasons explained below, both motions are denied.

## I.  CHC'S MOTION TO DISMISS (ECF No. 92)

**A.    Legal Standard**

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a claim in a complaint for "failure to state a claim upon which relief can be granted."  The 12(b)(6) standard requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations and view them in the light most favorable to the plaintiff."  *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).  In ruling on such a motion, the dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Granting a motion to dismiss "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice."  *Dias v. City & Cnty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (internal quotation marks omitted).  "Thus, 'a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'"  *Id.* (quoting *Twombly*, 550 U.S. at 556).

**B.    Factual Allegations**

The Court assumes the following to be true for purposes of resolving CHC's Motion to Dismiss.

For reasons not explained anywhere in the record, on April 2, 2014, Walter was arrested by Fremont County sheriff's deputies and taken to the Fremont County Detention Center ("Detention Center").  (ECF No. 84 ¶ 64.)  Medical matters at the

detention center are handled by CHC, a private organization with whom Fremont County has contracted for this purpose.  (*Id*. ¶¶ 15–19.)

At the time of his arrest, Walter lawfully possessed on his person "several bottles of prescription medication."  (*Id*. ¶ 66.)  Among those medications were methadone and Klonopin.  (*Id*.)  Klonopin is a drug in the benzodiazepine family.  (*Id*. ¶ 59.)  It is used to "treat anxiety disorders and various other mental and physical conditions."  (*Id*.)  It is also highly addictive and can lead to life-threatening withdrawal symptoms—commonly known as "benzo withdrawal"—if discontinued too quickly.  (*Id*. ¶¶ 59–60.)

Walter had been prescribed Klonopin for several years previous to his arrest and was "physiologically dependent" on it, putting him "at serious risk for benzo withdrawal should it be abruptly discontinued or the dosage reduced too quickly."  (*Id*. ¶ 63.)  On a medical intake form at the Detention Center, Walter specified that he had been prescribed Klonopin, as well as methadone.  (*Id*. ¶ 68.)  His bottles of medication were then confiscated.  (*Id*. ¶ 70.)

On April 3, 2014, the day after Walter's arrest, Physician Assistant Roy Havens "issued a provider's order, which included a tapering schedule for the Methadone and directions to initiate the corporate clinical protocol for benzodiazepine dependent detainees."  (*Id*. ¶ 72.)  This clinical protocol "would have required taking an appropriate history and initiating a tapering schedule with either Klonopin or a substitute benzodiazepine."  (*Id*. ¶ 73.)  The protocol would have also required close medical monitoring for the signs of benzo withdrawal.  (*Id*.)

For unexplained reasons, the clinical protocol "was not followed."  (*Id*.)  In

particular, Defendant Maestas, a LPN, "decided to disregard the benzo withdrawal protocol, and the other medical provider defendants went along with her decision." (*Id*. ¶ 75.) Walter's Klonopin was therefore abruptly discontinued, with no tapering or substitute. (*Id*. ¶ 74.) Walter then began experiencing benzo withdrawal, including the following symptoms: "acute gastrointestinal distress, lack of appetite and dramatic weight loss, incontinence, confusion, disorientation as to time and place, bizarre behavior, severe anxiety and panic, rapid mood swings, extreme restlessness and agitation, profound insomnia, delusional thinking, paranoia, hallucinations, delirium, tremors, twitching, incontrollable [*sic*] shaking, and seizures." (*Id*. ¶ 76.)

Between April 3 and 12, 2014, Walter made multiple requests to various defendants to be given Klonopin, but all such requests were ignored or rejected. (*Id*. ¶ 77.) By April 13, Walter "was hallucinating and talking to the walls about nonsensical things. He was constantly shaking and twitching. Detention staff reported to the nursing staff . . . that [he] was confused and speaking of conversations and events that never took place." (*Id*. ¶ 78.)

On April 14, 2014, detention personnel moved Walter into a single cell, away from other inmates. (*Id*. ¶ 79.) On April 15, Fremont County detention personnel,

> repeatedly used extreme and objectively unreasonable force on Mr. Walter. This included, but was not limited to, pepper spraying him, shocking him with a Taser, forcibly strapping him into a restraint chair (on at least two separate occasions), and using multiple forms of hands-on physical force—including pressure points, joint locks, and other pain compliance techniques—as well as severe physical beatings that caused subcutaneous contusions, numerous broken bones, and internal bleeding.

(*Id*. ¶ 80.)  Detention personnel employed this force on account of some unexplained noncompliance with orders.  (*Id*. ¶ 82.)

Also on April 15, 2014, Walter was moved into "one of the front facing holding cells located across from the booking area. . . .  Through one or more large windows in his observation holding cell, Mr. Walter was plainly visible to anyone at or near the booking area."  (*Id*. ¶ 83.)  Thus, for the next five days that Walter occupied that cell, "[e]very single [Fremont County] detention supervisor and officer and every single corporate medical provider who entered the [Detention Center] . . . , including all of the individual defendants named in this complaint (with the possible exception of Defendant Herr), saw Mr. Walter and saw that he was obviously in need of immediate medical attention."  (*Id*.)  In particular, any observer could see that Walter:

- was severely malnourished and dehydrated (*id*. ¶ 84);

- "was incontinent and had lost bowel and/or bladder control, likely defecating and/or urinating on himself or in his surroundings" (*id*. ¶ 85);

- was "sweating, twitching, trembling, and lying on the floor while uncontrollably shaking and, most likely, suffering from repeated seizures" (*id*.);

- was disoriented, talking to persons not present, and speaking about events that never happened (*id*. ¶ 86);

- often went without sleep, paced his cell, rolled around on the floor while yelling, removed his clothes and writhed naked on the floor (*id*.);

6

- at times kicked, punched, and clawed at the walls and door of his cell, apparently attempting to escape imaginary people (*id*.).

All the while, medical and other personnel were watching his symptoms but doing nothing. (*Id*. ¶¶ 87–93.)

On April 19, 2014, Defendant Lightcap, a detention officer, documented excessive bruises and unhealed wounds all over Walter's body. (*Id*. ¶ 96.) She also documented his weight loss, his tremors, and that his sleeping mat smelled like urine. (*Id*.) Other detention officers witnessed the same things that day. (*Id*. ¶ 97.)

Also on April 19, CHC's Chief Medical Officer, Defendant Herr, received a report of Walter's "dire medical condition." (*Id*. ¶ 99.) Herr responded that "nothing could be done for Mr. Walter." (*Id*.)

On the morning of April 20, 2014, Maestas visited Walter and saw him "lying on the ground, naked, severely injured, manifestly malnourished and dehydrated, shaking, and unable to even sit up on his own." (*Id*. ¶ 100.) Maestas still took no action. (*Id*.) For the rest of the morning, Walter was "lying naked on the floor, twitching, shaking, seizing, and convulsing." (*Id*. ¶ 101.) Various detention officers saw him in that state. (*Id*.)

Later that day, Walter was found dead in his cell. (*Id*. ¶ 102.) A later coroner's examination found

> numerous abrasions and contusions all over his body, including his forehead, scalp, right ear, chest, upper back, shoulders, arms, wrists, fingers, buttocks, thighs, knees, ankles, shins, feet, toes, toenails, and heels. He also had subcutaneous hemorrhaging of his spine hip, and shoulder, at least nine broken ribs with significant surrounding

hemorrhage, internal bleeding, and other significant injuries.

(*Id.* ¶ 103.)

## C.   Claims Against CHC

The Walter Estate now sues all of those allegedly involved in Walter's death under various theories of liability under 42 U.S.C. § 1983.  As against CHC, the Walter Estate alleges a number of municipal liability theories,[1] namely:

1.   "constitutionally deficient screening policies and procedures that were inadequate to protect detainees, like Mr. Walter, from the serious medical consequences of benzodiazepine withdrawal" (ECF No. 84 ¶ 115);

2.   "unconstitutional policies and procedures for managing individuals who were going through benzo withdrawal and withdrawal from other prescription medication and substances" (*id.*);

3.   "constitutionally inadequate policies and procedures related to communication amongst its medical providers and between its medical providers and detention personnel regarding detainees who are at risk of benzo withdrawal or who are actively withdrawing from a benzodiazepine" (*id.*);

4.   "a pattern, practice, or custom of unconstitutional conduct toward confined persons with serious medical needs, including failing to secure medical care for such individuals," allegedly evidenced by "numerous instances in

---

[1] CHC is a private company, not a municipality, but it was under contract to Fremont County to perform services that Fremont County would otherwise be required to perform.  No party contests the proposition that CHC, in these circumstances, may be liable as if a municipality.

Colorado and nationwide of inmates and detainees being deprived [of] needed medical care by [CHC] as a result of the deliberately indifferent corporate customs and practices" (*id.* ¶ 117);

5.   "a pattern and practice" of denying medical care to avoid the cost, as allegedly evidenced by "numerous other detainees and inmates in Colorado and elsewhere [who] were denied or delayed needed medical care and needed prescription medications in order to avoid the cost and expense of such medical care and medications" (*id.* ¶¶ 118–22);[2]

6.   "fail[ure] to adequately train and/or supervise its personnel, agents, and or subcontractors with regard to complying with constitutionally-minimal rights of confined persons to medical care, food, and water," including through a "deliberate choice not to provide training on (1) the subject of benzodiazepine withdrawal and withdrawal from other prescription medication and substances, (2) the subject of managing and responding to detainees who are in a mental health crisis, such as individuals suffering from acute benzo withdrawal psychosis, and (3) the subject of dehydration and malnourishment," and also through "the deliberate choice not to provide training to detention staff personnel on recognizing the

---

[2] The Walter Estate claims this desire to avoid cost and expense is motivated by the contractual structure with Fremont County, which is allegedly as follows: "[CHC] agreed [to] pay the costs of outside medical care (such as transportation, hospital visits, and other costs) up until it reached a certain point or 'cap.'  If outside medical care exceeded the cap, then Fremont County would be responsible for amounts above the cap.  If, on the other hand, the Corporate Defendants beat the cap, then they would get to keep the difference between the outside medical care costs and the cap as profit.  This same cap system was in place for prescription medications."  (*Id.* ¶ 119.)

signs, symptoms, and seriousness of benzodiazepine withdrawal" (*id*.

¶ 116); and

7.      "ratifi[cation of] unconstitutional conduct of [CHC's] employees, agents,

and/or subcontractors with regard to the unconstitutional conduct visited

upon Mr. Walter" (*id*. ¶ 124).

For the remainder of this order, the Court will refer to these theories by the numbers

assigned in the foregoing list (*e.g.*, "theory no. 2").

**D.      Analysis**

CHC's Motion to Dismiss challenges the pleading sufficiency of all of these

theories except no. 7 (ratification).  (ECF No. 92 at 6–15; *see also* ECF No. 104 at 2

n.2.)[3]  CHC specifically challenges theory nos. 1–5 as suffering a common deficiency,

and theory no. 6 as suffering a separate deficiency.  The Court will therefore first

address theory nos. 1–5, and then theory no. 6.

1.      Claims of Policy, Practice, or Custom (Nos. 1–5)

CHC attacks theory nos. 1–5 for failure to include allegations regarding the

"widespread" nature of the policies in question.  (ECF No. 92 at 6–10.)  CHC

fundamentally misunderstands when "widespread" allegations are required.

All of the major cases CHC cites make clear that an informal *custom or practice*

must be "widespread," but no such requirement exists for a formal *policy*.  *See City of St.*

*Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) ("the Court has long recognized that a

plaintiff may be able to prove the existence of a widespread practice that, although not

_____

[3] All ECF page citations are to the page number in the ECF header, which does not
always match the document's internal pagination, particularly in exhibits.

authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law" (internal quotation marks omitted)); *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008) ("Ms. Carney has neither alleged nor produced any evidence suggesting that her purported discrimination was caused by any [formal policy].  Accordingly, in order to defeat summary judgement, Ms. Carney must produce evidence that her alleged discrimination was the result of a municipal *custom*. [¶] A 'custom' has come to mean an act that, although not formally approved by an appropriate decision maker, has such widespread practice as to have the force of law." (certain internal quotation marks omitted; emphasis in original)); *Randle v. City of Aurora*, 69 F.3d 441, 447 (10th Cir. 1995) (citing *Praprotnik* specifically for its application to an allegation of "a custom of discriminatory personnel practices").  Only theory nos. 4 & 5 are described in the language of a custom or practice.  Thus, CHC's argument has no relevance to theory nos. 1–3.

As for nos. 4 & 5, CHC faults the Walter Estate for claiming to be aware of numerous examples of unconstitutional behavior in Colorado and throughout the country, yet not citing any.  (ECF No. 92 at 8–9.)  CHC adds that, by its own count, there are at least 170 online-accessible court decisions "discussing claims of § 1983 entity liability against the CHC Defendants."  (ECF No. 104 at 10 n.7.)  Yet the Walter Estate cites none of them—although a declaration from the Walter Estate's attorney regarding the parties' pre-filing meet-and-confer efforts mentions one case from this District with roughly similar allegations.  (ECF No. 97 ¶ 14 (citing *McGill v. Corr. Healthcare Cos.,*

*Inc.*, 2014 WL 2922635 (D. Colo. June 27, 2014)).)[4]

The Court agrees that this is somewhat unusual.  If cases throughout the country allegedly support this claim, the Court can see no reason why the Walter Estate would not cite at least a representative sample—in the Complaint, or even in response to the Motion to Dismiss.  *Cf. O'Brien v. DiGrazia*, 544 F.2d 543, 546 n.3 (1st Cir. 1976) ("when a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist").

The Court, however, will not dismiss theory nos. 4 & 5 at this stage because doing so would not serve the purposes of a Rule 12(b)(6) motion.  The standards for evaluating Rule 12(b)(6) motions, as stated in *Twombly* and *Iqbal*, are transparently motivated by the costs and other burdens of discovery.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."); *Twombly*, 550 U.S. at 557–60 (discussing at length the "*in terrorem* increment of the settlement value" caused by allowing insufficiently supported claims to go to discovery).  In this case, the purposes of *Twombly* and *Iqbal* would not be advanced by an order dismissing theory nos. 4 & 5.  Given that CHC does not challenge the Walter Estate's ratification theory (no. 7) and has no on-point argument against the Walter Estate's municipal policy theories (nos. 1–3), all of the relevant Defendants will remain in the case regardless and will be subject to

---

[4] The main allegation in *McGill* was that the plaintiff suffered a stroke while incarcerated but CHC employees "refused to hospitalize him or provide him with other emergency medical care for 16 hours."  2014 WL 2922635, at *1.

discovery. CHC has not explained how such discovery would be limited in any material way if theory nos. 4 & 5 were dismissed.

Moreover, theory nos. 4 & 5 are fairly seen as facets of an overall claim that CHC's acts or omissions contributed to Walter's death. Thus, if the Court were to dismiss theory nos. 4 & 5, it actually might *complicate* discovery, because CHC would have an incentive to object to any interrogatory, deposition question, etc., to the extent CHC believes it is really directed at custom or practice (theory nos. 4 & 5) rather than formal policy or ratification (theory nos 1–3 & 7). But the distinction is likely to be fairly fine, and not worth consuming the parties' and Court's time and resources in light of all of the claims that are going forward anyway.[5]

For all of these reasons, the Court rejects CHC's challenge to theory nos. 1–5.

2.    <u>Failure to Train (No. 6)</u>

CHC attacks the Walter Estate's various failure-to-train allegations (theory no. 6) on two grounds: first, failure to plead CHC's notice of its need to train; and second, failure to plead a causal link between the alleged lack of training and Walter's injuries. The Court will address these two arguments in turn.

a.    *Notice*

One element of a failure-to-train claim is that municipal policymakers have "actual or constructive notice that a particular omission in their training program causes

---

[5] It is also worth noting that Walter—who was in the best position to observe what was and was not happening to him, and therefore in the best position to provide facts from which municipal liability could be inferred—is dead. Thus, there is an "asymmetry of information" here beyond that which normally exists. *Tantlinger v. Duchaine*, 2015 WL 3941503, at *4 (D. Colo. June 26, 2015) (internal quotation marks omitted).

[municipal] employees to violate citizens' constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). CHC argues that the Complaint contains no allegations that CHC was on notice of any such omission. (ECF No. 92 at 11–12.) For two reasons, the Court declines to dismiss theory no. 6 on these grounds.

First, actual notice is not required if the training deficiency is sufficiently obvious:

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need.

*City of Canton v. Harris*, 489 U.S. 378, 390 (1989).[6] Here, the "so obvious" test is easily satisfied. It is beyond reasonable dispute that American jails and prisons routinely house mentally ill inmates, including those with substance dependencies that cannot be abruptly ended. Thus, failure to train prison staff, and particularly medical staff, on appropriate treatment of these inmates is "so likely to result in the violation of constitutional rights" that policymakers need no actual notice of repeated violations.

Second, as with the Walter Estate's other theories, dismissing this failure-to-train claim would not serve the purposes of a Rule 12(b)(6) motion. (*See* Part I.D.1, *supra*.) Even if the Court were to dismiss the claim, questions about training received or not received would still be relevant to the remaining causes of action. Thus, such a dismissal would have no practical effect except to potentially complicate discovery to the extent CHC attempts to avoid discovery it perceives as aimed at reviving a failure-to-train claim.

---

[6] *Connick* treats this example from *City of Canton* as only a "hypothesized" form of liability. *See Connick*, 563 U.S. at 63. The Tenth Circuit, however, treats it as established. *See, e.g.*, *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 773 (10th Cir. 2013).

b.    *Causation*

CHC's final argument centers around causation.  CHC does *not* argue that the

Walter Estate fails to allege a causal connection between the alleged lack of training

and Walter's injuries—and the Walter Estate certainly has made such an allegation.

(*See* ECF No. 84 ¶ 123.)  Rather, CHC argues that the Walter Estate's failure-to-train

causation theory is inconsistent with allegations elsewhere in the Complaint that CHC

employees disregarded CHC's established clinical protocol of weaning a

benzodiazepine addict slowly and gradually from his or her addiction.  (ECF No. 92 at

12–15.)  *See also Porro v. Barnes*, 624 F.3d 1322, 1328–29 (10th Cir. 2010) (no

municipal liability where employee "was acting in defiance of [municipal] policy" when

he caused the complained-of injuries).

CHC is correct that, if it has a clinically sound benzodiazepine policy, such a fact

is inconsistent with the Walter Estate's allegation that CHC lacked sufficient policies.

(*See* ECF No. 84 ¶ 115.)  That is not necessarily inconsistent, however, with the claim

that CHC failed to train its employees regarding those policies—and such a claim is a

fair reading of the Walter Estate's complaint.  (*Id*. ¶ 116.)  In any event, at this early

stage the Walter Estate "may state as many separate claims . . . as it has, regardless of

consistency."  Fed. R. Civ. P. 8(d)(3).

For all the foregoing reasons, CHC's Motion to Dismiss will be denied.

## II.  THE HAVENS ESTATE'S MOTION TO DISMISS (ECF No. 114)

Rather than challenging the sufficiency of the pleadings, the Havens Estate's

Motion to Dismiss focuses on a claim that Walter did not file within the applicable

15

statute of limitations.

## A.  Legal Standard

The legal standard is the same as that stated above in Part I.A.  In this context, however, it is worth noting that "[i]f the allegations . . . show that relief is barred by the applicable statute of limitations, the complaint is subject to dismissal for failure to state a claim." *Jones v. Bock*, 549 U.S. 199, 215 (2007).  The applicable statute of limitations for § 1983 actions brought in Colorado is two years from the time the cause of action accrued.  *Fogle v. Pierson*, 435 F.3d 1252, 1258 (10th Cir. 2006); *see also* Colo. Rev. Stat. § 13-80-102(1)(g).  In addition, to the extent applicable, Colorado law regarding tolling applies in federal court.  *Fratus v. DeLand*, 49 F.3d 673, 675 (10th Cir. 1995) ("For section 1983 actions, state law determines the appropriate statute of limitations and accompanying tolling provisions.").

## B.  Background

As noted in Part I.B, above, P.A. Roy Havens was allegedly the individual who "gave the order to 'start' [CHC's] clinical 'protocol' to discontinue Mr. Walter's benzodiazepine prescription."  (ECF No. 84 ¶ 73.)  Havens, however, died on February 4, 2016, before this action commenced.  (*Id*. ¶ 25.)  His death precipitates the statute of limitations question raised here.  For present purposes, the following events are relevant to resolving this issue:

| April 20, 2014 | Walter's death, thus triggering the two-year limitations period.[7] |
|---|---|
| February 4, 2016 | Roy Havens's death. |
| March 17, 2016 | The Walter Estate files this action.  (ECF No. 1.)  Its complaint includes a notice of "intent to amend . . . to add the following [parties]," including the "person who signature reads as follows," followed by a scanned image of an inscrutable signature.  (*Id.* ¶ 64(A).) |
| April 20, 2016 | Last day the Walter Estate could file a cause of action, subject to arguments addressed below. |
| May 5, 2016 | The Walter Estate somehow learns that the signature belonged to Havens, and then files its First Amended Complaint.  (ECF No. 65.)  That complaint contains a notice of "intent to amend . . . to add the following," including "[t]he special administrator or personal representative of the Estate of Roy Havens. . . .  The Estate of Roy Havens is in the process of being formed under the laws of the State of Colorado.  Following its formation, plaintiff intends to amend this complaint to add the Estate's special administrator or personal representative as a defendant."  (*Id.* ¶ 58(A).) |
| June 16, 2016 | Fremont County District Court grants the Walter Estate's petition to appoint Havens's surviving spouse as personal representative of his estate.  (ECF No. 116-1.) |
| | The Walter Estate files the Second Amended Complaint, formally naming the Havens Estate through its administrator, Linda Havens.  (ECF No. 84 ¶ 25.) |

## C.   Analysis

The Havens Estate claims that the Walter Estate's cause of action expired on

April 20, 2016.  (ECF No. 114 at 7.)  Although the Walter Estate filed its original

complaint before that date, it did not name Havens or his estate as a defendant, but

---

[7] The parties mention the possibility that Walter's claim began to accrue on April 3, 2014, when benzodiazepine was first withdrawn, and continued to accrue through his death.  (*See* ECF No. 114 at 7; ECF No. 115 at 5.)  However, none of the parties' arguments turn on this possibility.  Thus, for simplicity, the Court will treat Walter's date of death as the accrual date.  In so doing, the Court leaves for another day—to the extent it ever becomes relevant— whether his claim accrued any earlier than that.

17

only gave notice of its intent to discover the source of a certain signature.  The Walter

Estate pleaded that identity in its First Amended Complaint on May 5, 2016, after the

statute of limitations supposedly expired.  The Havens Estate argues that this course of

proceedings implicates the relation back provisions in Federal Rule of Civil Procedure

15, and also argues that relation back cannot apply here.  Specifically, the Havens

Estate points to Rule 15(c)(1)(C):

> An amendment to a pleading relates back to the date of the
> original pleading when * * * the amendment changes the
> party or the naming of the party against whom a claim is
> asserted, . . . and if, within the period provided by Rule 4(m)
> for serving the summons and complaint, the party to be
> brought in by amendment:
>
> (i) received such notice of the action that it will not be
> prejudiced in defending on the merits; and
>
> (ii) knew or should have known that the action would have
> been brought against it, but for a mistake concerning the
> proper party's identity.

As to the requirement that "the amendment changes the party or the naming of the

party," the Havens Estate argues that it is not satisfied because no party or no name of

a party was changed, and John Doe defendants do not count.  (ECF No. 114 at 9

(citing *Garrett v. Fleming*, 362 F.3d 692, 696–97 (10th Cir. 2004)).)  As to the

requirement that the defendant receive "notice," the Havens Estate asserts that a

deceased person cannot receive notice.  (*Id*. at 9–10 (citing *Currier v. Sutherland*, 218

P.3d 709, 715 (Colo. 2009)).)  Finally, the Havens Estate claims that the Walter Estate

cannot claim a "mistake concerning the proper party's identity" because it knew that

there was some definite individual it was seeking to sue but simply did not learn the

individual's name soon enough.  (*Id*. at 10.)

18

In response, the Walter Estate does not attempt to refute these Rule 15(c)(1)(C) arguments.  The Walter Estate instead points to the following statutory provision from the Colorado Probate Code: "The running of any statute of limitations measured from some event other than death[8] or the giving of notice to creditors for claims against a decedent is suspended during the four months following the decedent's death but resumes thereafter . . . ."  Colo. Rev. Stat. § 15-12-802(2).  The Walter Estate explains this subsection as follows:

> The intent of the foregoing provision is clear.  A tort victim would ordinarily be required to sue his or her tortfeasor within two years from the date of the tort.  But when the tortfeasor dies before the action can be filed (whether that occurs one day, one week, or at any time before the two-year period expires), the victim cannot sue without first ensuring that the tortfeasor's estate is set up and a personal representative appointed to become the real party in interest.  This necessarily takes time.  The Colorado Legislature therefore chose to ensure that tort victims would not be prejudiced by the tortfeasor's death, giving the victim (or, in this case, his estate) an additional four months to take the necessary steps to form the decedent's estate and commence suit against it.

(ECF No. 115 at 6.)  The Walter Estate attaches an unreported Colorado Court of Appeals decision, *Hoffman v. Estate of Donald Chandler and Julie Fisher*, No. 14-CA-1742 (Colo. App. Sept. 17, 2015), that interprets this subsection in this manner.  (ECF No. 116-3 at 13, 18.)  According to the Walter Estate, therefore, its cause of

---

[8] When quoting this statute, the Walter Estate inserts in brackets at this point "of the decedent whose estate is being administered."  (ECF No. 115 at 6.)  Conceivably, however, one could argue that this language refers to a cause of action triggered by the death of the person who would assert the cause of action.  But the Havens Estate does not argue as much.  Accordingly, the Court deems the Havens Estate to have conceded the Walter Estate's interpretation, and the Court will not examine this question further.

action against the Havens Estate stopped running on February 4, 2016, which was 76

days before April 20, 2016, when the two-year period would normally expire.  Then, on

June 4, 2016, the statute of limitations began to run again for the remaining 76 days,

finally expiring on August 19, 2016.  (ECF No. 115 at 7–8.)[9]  Because both the First and

Second Amended Complaints were filed before then, either one was timely without

need of any relation back.

The Court agrees with the Walter Estate's argument, and finds the Havens

Estate's counterarguments unpersuasive.  First, the Havens Estate argues that "[t]here

are no [precedential] cases in which a Colorado court has chosen to apply C.R.S.

§ 15-12-802(2) in the way [the Walter Estate] suggests that it should be [applied] now,"

in particular, to "tort or § 1983 claims."  (ECF No. 121 at 2.)  This appears to be true,

but there is no need for a court to affirm that a statute means what it plainly says.  If the

situation were otherwise, every new statute would essentially be non-citable until a

court gave its blessing.  And in any event, the language of this statute is unambiguous:

"[t]he running of *any statute of limitations*," other than exceptions not relevant here, "is

suspended during the four months following the decedent's death but resumes

thereafter."  Colo. Rev. Stat. § 15-12-802(2) (emphasis added).

Second, the Havens Estate argues that the statute "was intended to apply to

creditors claims on a decedent's debts," and apparently not to tort claims.  (ECF No.

121 at 2.)  As just noted, however, the statute says that it applies to "any statute of

limitations."  Moreover, the Havens Estate's only support for this interpretation is to note

---

[9] Walter actually argues that he could file "likely up until August 20, 2016" (*id*. at 8),
which appears to be a minor calculation error and has no effect on the outcome of this case.

that the statutory Part in which this provision appears (*i.e.*, Part 8 of Article 12 of Title 15 of the Colorado Revised Statutes) is titled "Creditors' Claims." The Havens Estate seems to believe that "creditor" is used here in the sense of "lender." This is incorrect. Although the Colorado Probate Code does not define "creditor," other provisions make clear that a creditor is any person "having claims against the . . . estate." Colo. Rev. Stat. § 15-12-801(1) (specifying the language of the notice that must be given to "creditors"). In turn, "claims" means "liabilities of the decedent or protected person whether arising in contract, in tort, or otherwise." Colo. Rev. Stat. § 15-10-201(8). In other words, consistent with usage in bankruptcy and other contexts, "creditor" simply refers to any person with a legally cognizable claim for money from the estate. That includes the Walter Estate.

Third, the Havens Estate argues that "[t]he best interpretation of the statute's language is that it acts as a four-month pause . . . . When the pause ends, the running of the statute of limitations, *if any is left*, resumes." (ECF No. 121 at 4 (emphasis added).) This is logically incoherent. The phrase "if any is left" can only presume that the statute of limitations is still running in some sense, even though it is also "paused." In any event, the plain language of § 15-12-802(2) appears aimed at heading off this precise argument: "The running of any statute of limitations . . . is *suspended* during the four months following the decedent's death but *resumes* thereafter" (emphasis added). There is no hint that the resumption only occurs if the statute of limitations would not have otherwise run out during the four-month suspension.

For all these reasons, the Havens Estate's Motion to Dismiss will be denied.

## III.  CONCLUSION

For the reasons stated above the Court ORDERS as follows:

1.  CHC's Motion to Dismiss (ECF No. 92) is DENIED; and

2.  The Havens Estate's Motion to Dismiss (ECF No. 114) is DENIED.

Dated this 3rd day of February, 2017.

BY THE COURT:

William J. Martinez
United States District Judge