**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 16-cv-0629-WJM-MEH

THE ESTATE OF JOHN PATRICK WALTER,
by and through its personal representative, DESIREE' Y. KLODNICKI,

      Plaintiff,

v.

CORRECTIONAL HEALTHCARE COMPANIES, INC.;
CORRECTIONAL HEALTHCARE PHYSICIANS, P.C.;
CHC COMPANIES, INC.;
THE BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF FREMONT;
JAMES BEICKER, individually and in his official capacity as Fremont County Sheriff;
TY MARTIN, individually;
RAYMOND HERR, M.D., individually;
THE ESTATE OF ROY D. HAVENS, by and through its personal representative, Linda Havens;
STEPHANIE REPSHIRE, LPN, individually;
KATHLEEN MAESTAS, LPN, individually;
SHARON ALLEN, M.D., individually;
JOHN RANKIN, individually;
JOHN DOES 1–10, individually;
JANE DOES 1–10, individually; and
DOE CORPORATIONS 1–10,

      Defendants.

---

## ORDER DENYING SUMMARY JUDGMENT MOTIONS

---

By way of 42 U.S.C. § 1983, this lawsuit addresses whether John Patrick Walter ("Walter") received unconstitutionally deficient medical care while in pretrial detention in Fremont County, Colorado, eventually causing his death. Specifically, Walter was deprived of a prescription anti-anxiety medication, allegedly creating severe withdrawal symptoms that eventually killed him. Walter's Estate, through its personal

representative ("the Estate"), sues numerous individuals and entities that are allegedly responsible for Walter's death.

Currently before the Court are two motions for summary judgment filed by various sets of Defendants. Fremont County and certain of its employees filed one of these motions. (ECF No. 167.) Two medical caregivers who interacted with Walter during his detention filed the other motion. (ECF No. 185.) For the reasons explained below, both motions are denied.

## I. LEGAL STANDARD

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to proper disposition of the claim. *Wright v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).

In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *See Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. FACTS

For present purposes, the following facts are undisputed unless attributed to a party or a witness, or otherwise noted.

### A.    Fremont County's Relationship with CHC

At all times relevant to the Estate's allegations, Defendant Correctional Healthcare Companies, Inc. ("CHC") was Fremont County's private contractor for healthcare services at the Fremont County Detention Center ("Detention Center"). (ECF No. 167 at 3, ¶¶ 8–9.)  Through the contract between Fremont County and CHC, CHC "became a policymaker for Fremont County with the power to make and change [Detention Center] healthcare policies without [the Sheriff's] approval."  (ECF No. 187 at 6, ¶ 2.)

In April 2014, CHC employed the following individuals, all of whom had some connection to CHC's contract services to the Detention Center:

- Defendant Raymond Herr, M.D., CHC's chief medical officer;

- Defendant Sharon Allen, M.D., a psychiatrist;

- Physician Assistant Roy Havens;[1] and

- Defendant Kathy Maestas, Defendant Stephanie Repshire, and non-party Monica Doughty, all of whom are licensed practical nurses.

(ECF No. 167 at 4–5, ¶¶ 11–14.)  Dr. Allen and Nurse Repshire are the summary judgment movants in ECF No. 170.  No other CHC-affiliated defendant moves for summary judgment.

---

[1] Havens died in February 2016 (*see* ECF No. 172 at 2, ¶ 6) but Walter's Estate named Havens's Estate as a Defendant in this action.

**B.      Benzodiazepines**

This case revolves around a class of anti-anxiety drugs known as benzodiazepines, sometimes colloquially referred to as "benzos." High doses of benzodiazepines over an extended time can create physical dependency, potentially leading to withdrawal symptoms when the medication is discontinued. (ECF No. 185 at 8–9, ¶¶ 6–7.)

The parties and their experts are at odds over precisely what symptoms should be expected from benzodiazepine withdrawal, and just how dangerous such withdrawal can be. (*See, e.g.*, *id.*; ECF No. 170 at 8, ¶ 21; *id.* at 10, ¶ 35.) The parties agree, however, that the medical literature documents only two case studies of individuals dying from suspected benzodiazepine withdrawal, and neither study involved the benzodiazepine at issue here, clonazepam. (*Id.* at 8, ¶¶ 22–23.) The Estate nonetheless considers these statistics "highly misleading" because, it says, "very few deaths are the subject of 'documented case studies.'" (ECF No. 185 at 5, ¶ 23 (emphasis removed).) Moreover, the Estate emphasizes Dr. Herr's purported agreement with the statement that "death is a well-recognized risk of acute benzo withdrawal." (*Id.*)[2]

The parties' experts also hotly dispute the potential dangers of a "cold turkey" approach to ending a benzodiazepine regimen. The Estate's experts assert that benzodiazepines "should never be abruptly discontinued," and "[a]ll reasonable jail medical personnel" understand as much. (ECF No. 170 at 12, ¶ 45.) Dr. Allen's and

---

[2] Dr. Herr's position is not quite as clear as the Estate portrays it. At his deposition, he was asked, "Is death a well-recognized risk of acute benzo withdrawal?" He answered, "Yes. I think—yes. I'll—yes." (ECF No. 185-1 at 6.)

Nurse Repshire's expert counters that "the hazards of abrupt benzodiazepine discontinuation are greatly exaggerated." (ECF No. 185 at 9, ¶ 11 (internal quotation marks omitted; alterations incorporated).)

**C.    Walter's Confinement and Death at the Detention Center (April 3–20, 2014)**

1.    April 3

On the morning of Thursday, April 3, 2014, Walter was booked into the Detention Center on assault-related charges stemming from a fight the night before. (ECF No. 167 at 2, ¶¶ 1–3.) At booking, he completed a "Pre-Admission Medical Screen" form in which he declared that he was currently taking two prescribed medications: methadone and Klonopin, the latter being a brand name for clonazepam. (ECF No. 167-3 at 2.) Walter had a prescription bottle of Klonopin on his person, which Detention Center staff confiscated and—according to the Estate and the County Defendants—delivered to the CHC medical staff. (ECF No. 167 at 3, ¶ 7; ECF No. 185 at 10, ¶ 16.)

Later that day, Physician Assistant ("PA") Havens filled out a "provider order" to "start Benzo protocol to DC [*i.e.*, discontinue] Benzodiazepines." (ECF No. 173-2.) This brief notation apparently implies two policies or protocols. The first is an unwritten "no benzo" policy that, according to Nurse Maestas, CHC implemented and the Detention Center medical staff regularly followed. (ECF No. 185 at 11, ¶¶ 22–23; ECF No. 187 at 13, ¶ 31.) This meant that Walter was immediately and completely cut off from his Klonopin, without a chance for gradually tapering his dosage. (ECF No. 185 at 11, ¶ 21.) The second is a written policy known as the "L-06" protocol, which required CHC employees to "[m]onitor for withdrawal symptoms using [an attached] benzodiazepine withdrawal monitoring sheet. The Provider on-call [a doctor or physician assistant]

should be notified immediately if there are any signs or symptoms of withdrawal."  (ECF No. 186-3 at 2.)

Monitoring for withdrawal symptoms included measuring blood pressure, pulse, respiration, and temperature.  (*Id.*)  But CHC's on-site nurses, including Maestas and Repshire, did not initiate the L-06 protocol.  (ECF No. 185 at 12, ¶ 27.)  Nurse Maestas characterized this as a "significant oversight."  (ECF No. 201-1 at 51.)

2.    April 3–12

Walter was initially housed with other inmates in an area of the Detention Center known as the "T-Pod."  (ECF No. 185 at 12, ¶ 28.)  Two of Walter's fellow inmates in the T-Pod have submitted declarations in this case.  (*See* ECF Nos. 185-5, 185-22.)  They say that Walter arrived at the Detention Center in a normal, healthy condition, but gradually deteriorated over the next two weeks.  (ECF No. 185 at 13–14, ¶¶ 29, 34–35.)  They say that he also repeatedly asked nurses such as Maestas and Repshire for his Klonopin, but the nurses took no action.  (*Id.* ¶¶ 30–32.)  Eventually, Walter stopped eating or sleeping regularly, and he began trembling, pacing, talking nonsensically, and removing his clothes.  (*Id.* ¶¶ 34–35.)

3.    April 13

On April 13, former Defendant Charlene Combs (a Detention Center deputy) interacted with Walter and became concerned about him because of his mental confusion, tremors, and involuntarily eye twitching.  (*Id.* at 14, ¶ 37.)

On that same day, a nurse who is not a defendant here measured Walter's blood pressure and found it to be abnormally high.  (*Id.* at 15, ¶ 39.)  She ordered that Walter's blood pressure be checked daily for the next five days, but there is no record

that anyone carried out this order. (*Id.*)

    4.    April 14

On April 14, a Detention Center corporal who is not a defendant here spoke with

Walter and noted that he was confused and shaking during the entire interaction. (*Id.*

¶ 40.) That same day, Walter's cellmates submitted a complaint that Walter had been

keeping them up all night by "talking to the wall." (*Id.*)

    5.    April 15

In the early morning of April 15, Walter began kicking and banging on his cell

door demanding to be let out. (ECF No. 167 at 6, ¶ 20.) Inmates began screaming at

Walter to "knock it off." (*Id.* ¶ 21.) Certain Detention Center officers who were formerly

defendants in this case (Green, Cullen, and Cook) decided to move Walter to a holding

cell away from other inmates. (*Id.* ¶ 25.) Walter, likely delusional at the time, did not go

easily and the officers used a Taser and bodily force to gain his compliance. (ECF No.

185 at 15, ¶ 41.)

Walter was then placed in "a small holding cell in the jail's booking area known

as Holding Cell 2." (*Id.* ¶ 42.) The holding cell had large windows through which

anyone in the booking area could easily observe Walter. (*Id.* at 16, ¶ 43.)

Detention Center officers used force on Walter twice more that day: once to put

him in a restraining chair when he was punching the window of the holding cell, and

once when he apparently tried to escape while being escorted to the showers. (ECF

No. 167 at 7–10, ¶¶ 36–55.) The first use of force involved pepper spray and the

second involved bodily force and a Taser. (*See id.*)

The Estate's experts claim that the standard of care in the medical community

dictated that someone with Walter's symptoms of mental distress should have been hospitalized by this point. (ECF No. 185 at 16, ¶ 46.) But no one called for an ambulance—that day or any other, until it was too late—because of a Sheriff's Department policy against such calls unless CHC's on-site supervisor (at that time, Nurse Maestas) approved the call or the inmate displayed "very obvious life-threatening injuries such as bleeding and unresponsiveness." (ECF No. 187 at 27, ¶ 87 (internal quotation marks omitted).)

      6.    <u>April 16</u>

On the morning of April 16, Nurse Repshire saw Walter and noted that he was "acting very, very strange, talking to himself & 'others' & trying to unlock his cell." (ECF No. 167-18.) She gave him a dose of methadone, from which (unlike Klonopin) the medical staff was gradually weaning him. (*Id.*) As she handed the medicine to him through a hole in the cell door, she noticed that the cell "smelled." (*Id.*) She chose not to check his blood pressure "due to his strange behavior." (*Id.*)

By this time, the commander of the Detention Center, Defendant Rankin, had seen for himself that Walter looked pale and thin; that he would not wear clothes and had stopped regularly eating or sleeping; that he seemed unaware of his surroundings; that he was speaking to people who were not there; and that he was otherwise frequently talking nonsensically, yelling, and screaming. (ECF No. 185 at 18, ¶¶ 55–56.) Rankin's subordinates also expressed concern to him about Walter. Rankin then voiced his concerns to Nurse Repshire. (*Id.* at 19, ¶ 58.)

According to Nurse Repshire's medical notes, Rankin "wondered if we should be weaning [Walter] off his meds due to him being on them for years. . . . He noticed

[Walter] was fine before we started weaning him off & wondered if there was anything we could do." (ECF No. 167-18.) Repshire finished this note by stating, "I will refer to the provider," meaning PA Havens. (*Id.*; ECF No. 170 at 5, ¶ 13) This referral came by way of a Post-It note Repshire placed on Walter's medical chart. (ECF No. 185 at 3, ¶ 13.)

Later that day, Rankin went to his superior, Defendant Martin (undersheriff of Fremont County), and reported Walter's condition. (ECF No. 167 at 10, ¶ 58.) Rankin also relayed his and his subordinates' concern regarding the "apparent lack of medical response" from the Detention Center medical staff. (ECF No. 185 at 19, ¶ 59.)

Undersheriff Martin says that this conversation prompted him to speak with one of the nurses himself—the Estate claims it could only have been Repshire, given Repshire's work schedule and Martin's memory about who the nurse might have been. (ECF No. 167 at 11, ¶ 63; ECF No. 185 at 20, ¶ 61.) Martin says that he was assured by the nurse that the situation was under control and the medical staff was monitoring Walter closely. (*Id.*)

On this day or thereabouts, Commander Rankin also spoke with Defendant Beicker, sheriff of Fremont County. (ECF No. 187 at 22, ¶ 71.) Rankin only involved Sheriff Beicker "in serious situations." (*Id.*) Rankin gave Beicker a full description of Walter's condition to that point. (*Id.* at 23, ¶¶ 72–73.) And Rankin returned, with more dire reports, either one or two times in the next two days. (*Id.* ¶ 73.) During that same timeframe, Beicker also received a report from a Detention Center corporal "who seemed extremely upset, concerned, and disturbed . . . by Mr. Walter's continued deterioration." (*Id.* ¶ 74.) And Beicker personally observed Walter on two or three

occasions while he (Beicker) was in the Detention Center's booking area.  (*Id.* ¶ 75.)

Between this day (April 16) and April 20, Detention Center employees claim they repeatedly reported their concerns about Walter to their supervisors, and to Nurse Repshire directly, but Repshire allegedly continued to assure them that the medical staff was treating Walter according to protocol.  (ECF No. 167 at 12, ¶¶ 64–68.)

       7.   <u>April 17</u>

On April 17, PA Havens apparently noticed Nurse Repshire's abovementioned "referral" note and responded by writing his own assessment underneath Repshire's medical notes: "Weaning off methadone—[h]e may go through some withdrawal—I have no suggestions.  May call Dr. Herr for more advice."  (ECF No. 167-18.)

April 17 was also the date of Defendant Allen's only contact with Walter, a visit that lasted for approximately ten minutes.  (ECF No. 185 at 21, ¶ 65.)  As noted above, Dr. Allen is a psychiatrist employed by CHC.  On behalf of CHC, she visited the Detention Center for two hours every other week.  (*Id.*)

When Dr. Allen encountered Walter, he was naked, trembling, and disoriented, believing he was in a hospital.  (*Id.* ¶ 66.)  Allen knew from Walter's file that he had not been sleeping regularly.  (*Id.*)  He could not identify the current month or year.  (*Id.*)  He managed to inform her that he had been prescribed Klonopin, but he could not answer her questions about his regular dosage, the last time he took it, or the length of time it had been prescribed to him.  (*Id.* ¶ 68.)

Dr. Allen is trained to recognize and treat benzodiazepine withdrawal.  (ECF No. 170 at 7, ¶¶ 19–20.)  She knew from Walter's medical chart that Walter had not been receiving Klonopin since his admission to the Detention Center, and she considered the

possibility that Walter was in benzodiazepine withdrawal. (*Id.* at 8–9, ¶¶ 25, 27.) She claims, however, that she ruled out benzodiazepine withdrawal because the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition* ("DSM-5") suggested that Walter's symptoms should have been decreasing by that time (*i.e.*, two weeks after being cut off from benzodiazepines). (*Id.* at 9, ¶¶ 28–30.) In that light, she claims that she then considered other potential diagnoses and decided that Walter's symptoms were more consistent with bipolar disorder. (*Id.* at 10–11, ¶¶ 33–38.) She further claims that she felt confirmed in this diagnosis by an alleged conversation with Nurse Maestas in which Maestas informed her that Walter had not been compliant with his Klonopin prescription before entering the Detention Center—the inference being that Walter's symptoms were unlikely to flow from benzodiazepine withdrawal if he had not been taking benzodiazepines regularly before being cut off. (*Id.* at 11, ¶¶ 39–41.)

The Estate disputes most of Dr. Allen's account of her thought processes. The Estate argues that ten minutes' worth of observation would not have been enough time to make a differential diagnosis that ruled out benzodiazepine withdrawal. (ECF No. 185 at 6, ¶ 37.) The Estate also notes Allen's deposition testimony that she did not consult the DSM-5 when making her diagnosis. (*Id.* ¶ 33.) And the Estate denies that Allen's conversation with Maestas ever happened because, according to the Estate, Maestas was not at the Detention Center on April 17. (*Id.* at 26, ¶ 87.) The Estate also highlights Maestas's deposition testimony, in which she stated that she would not have had a basis to tell Allen that Walter had been noncompliant with his Klonopin prescription prior to his arrival at the Detention Center because none of the medical staff

had made any inquiry about Walter's compliance (*e.g.*, by contacting the prescribing physician). (*Id.* ¶ 88.) The Estate accordingly claims that Allen fabricated her account of the conversation with Maestas. (*Id.* ¶ 87.)

Regardless, Dr. Allen wrote a prescription for a drug intended to treat bipolar disorder. (ECF No. 170 at 11–12, ¶¶ 39, 42–43.) Allen then departed and took no further action concerning Walter. (ECF No. 185 at 21, ¶ 69.)

8.   <u>April 18</u>

It is not clear if anything of significance happened on April 18, unless some of the aforementioned complaints from Detention Center employees to their supervisors and to medical staff occurred on this date.

The Estate points out, however, that April 18 was a Friday, and that Sheriff Beicker, Undersheriff Martin, and Commander Rankin left for the weekend in the late afternoon. (ECF No. 187 at 25, ¶¶ 79–81.) The Estate asserts that leaving for the weekend in these circumstances, without taking action to ensure Walter's health and safety, was a "breach of the [relevant] standards of care." (*Id.* ¶ 82.)

9.   <u>April 19</u>

On April 19, former Defendant Sara Lightcap, a Detention Center deputy, began documenting her observations of Walter's condition. She described bruising all over his body, an apparently broken toe, and his "diminishing size." (*Id.* at 26, ¶ 85.)

Another Detention Center inmate with a view of Walter's holding cell states in a declaration that he saw Walter on this day and that Walter looked "like a living corpse." (*Id.* ¶ 84.) According to this inmate, anyone who observed Walter at that time would know that "the man was in dire need of medical attention." (*Id.*) This inmate further

claims he told the Detention Center guards that Walter was "going to die in here if you don't get him to a hospital." (*Id.*)

A Detention Center guard who has never been a defendant here claims he expressed a similar sentiment to one of his fellow guards, *i.e.*, "I would not be surprised if he dies tonight." (*Id.* ¶ 83.) The other guard allegedly concurred and expressed frustration about the medical staff. (*Id.*)

Repshire was on duty that day, and she wrote on Walter's medical chart that she noticed "new scrapes on his lower back & his R big toe was swollen & bruised & toes on his L foot had scabs." (ECF No. 167-18.) She also described a phone call with Dr. Herr (CHC's chief medical officer), who allegedly "advised we were doing everything that we needed to do for his withdraw[al]." (*Id.*) The Estate disputes that this phone call took place because Herr does not remember it and he was not the on-call provider that day. (ECF No. 185 at 4, ¶ 17.)

   10.   <u>April 20</u>

On April 20, at least two Detention Center guards observed Walter lying naked on the floor under his sink, shaking and quivering involuntarily. (ECF No. 187 at 27, ¶ 89.)

That evening, Walter was found unresponsive in his cell, and paramedics were called. (ECF No. 167 at 13, ¶ 73.) He was pronounced dead at 5:57 PM. (*Id.* ¶ 74.)

## D.   **Post-Death Investigation**

The El Paso County Coroner's Office autopsied Walter's body on April 25, 2014. (*Id.* ¶ 75.) In addition to extensive bruises and scrapes, the coroner noted significant internal injuries. (ECF No. 187 at 28, ¶¶ 90–91.) These internal injuries

included multiple posterior rib fractures—*i.e.*, many broken ribs on the back of his body where his ribs attached to his spine. They occurred "at the strongest point in the rib-cage" and a "great deal of externally-applied force would have been necessary to cause these fractures." The rib fractures could not have been self-inflicted, could not have been caused by resuscitative efforts, and were not caused after Mr. Walter's death. They occurred "within a few days of death" and were "probably caused by another person or persons kicking or stomping on the subject." Mr. Walter also had internal bleeding caused by someone beating, kicking, or stomping on him.

(*Id.* ¶ 91 (quoting the coroner's report; citations omitted).) The Estate claims that these

injuries could only have been caused by Detention Center guards. (*Id.* ¶ 92.)

In any event, the coroner originally concluded that the cause of death was

"undetermined." (ECF No. 167 at 13, ¶ 75.) "Three years later, with information learned

in this case," the coroner's office amended its report to state that "acute benzodiazepine

withdrawal" was the cause of death, although the "manner of death" remained

"undetermined." (*Id.* ¶ 76; ECF No. 187 at 29, ¶ 96.)

## III. ANALYSIS

### A. Claims Still At Issue

In the Second Amended Complaint (the currently operative complaint), the Estate

alleged that Walter died both (or alternatively) from constitutionally inadequate

treatment *and* excessive force. (*See* ECF No. 84 ¶¶ 102, 109–10, 180–208.) Fremont

County and its employees named as defendants here ("Fremont County Defendants")

argue in their summary judgment motion that whatever force the Detention Center

guards used against Walter was objectively reasonable, not excessive. (ECF No. 167

at 25–31.) The Estate's response brief continues to accuse the Detention Center

guards of inflicting severe trauma in the days just before Walter's death (*see* Part II.D,

above), but the Estate does not respond to the Fremont County Defendants' use-of-force arguments.  Rather, the response brief states in a footnote that the Estate "does not oppose dismissal" of Defendants Combs, Cook, Cullen, Green, Lightcap, Mass, Miller, Owen, Penn, Pohl, Solano, Ulrich, and Wheaton.  (ECF No. 187 at 1 n.1.)  Soon after the Estate filed this brief, the parties jointly dismissed these defendants.  (ECF No. 189.)

Consequently, the only remaining Fremont County Defendants are the County itself (via its Board of Commissioners), Sheriff Beicker, Undersheriff Martin, and Commander Rankin.  (ECF No. 187 at 1.)  Moreover, the Estate's only theory of liability asserted against any remaining Defendant (whether affiliated with the County or with CHC) rests on the notion that the Walter did not receive constitutionally adequate medical care.  (*See id.* at 30–40; ECF No. 185 at 33–40.)  In other words, the Estate has abandoned its excessive force claim.

## B.      Fourteenth Amendment vs. Eighth Amendment Liability

The legal standards governing a prisoner's right to constitutionally adequate medical care have been developed almost entirely under the Eighth Amendment's "cruel and unusual punishments" clause.  But "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions."  *Ingraham v. Wright*, 430 U.S. 651, 702 n.40 (1977).  Thus, for pretrial detainees, the source of the constitutional right to adequate medical care is the Fourteenth Amendment, not the Eighth.  *See Bell v. Wolfish*, 441 U.S. 520, 535 & n.16 (1979).

This distinction between the Eighth and Fourteenth Amendments has long been

treated as one without a difference. *See, e.g.*, *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1315 (10th Cir. 2002) (noting the distinction but stating that a "claim for denial of medical attention" in pretrial custody proceeds under "an analysis identical to that applied in Eighth Amendment cases"). But in *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), the Supreme Court held that *excessive force* claims in the pretrial detention context are judged differently than excessive force claims under the Eighth Amendment. Specifically, to prove excessive force under the Eighth Amendment, a convicted prisoner must demonstrate that the prison guard used force that was unreasonable under the circumstances (objective component) and that the prison guard knew or recklessly disregarded that fact (subjective component); whereas under the Fourteenth Amendment, a pretrial detainee need only prove that the force was unreasonable under the circumstances (objective component). *Id.* at 2471–76.

Although the Estate no longer pursues an excessive force claim, it highlights *Kingsley* as something "the Court should keep in mind," because it has prompted other courts to question whether *any* Fourteenth Amendment cause of action arising from alleged mistreatment in pretrial detention contains a subjective component. (ECF No. 185 at 30–32; *see also* ECF No. 187 at 30 n.4.) In the present context, this argument could have interesting consequences. Under the Eighth Amendment test for delay or denial of medical care, a prisoner must prove that (1) objectively, he or she had a serious illness or injury, (2) the defendant was aware of facts from which the inference could be drawn that the prisoner faced a substantial risk of serious harm, (3) the defendant subjectively drew the inference, but (4) the defendant did not act, and (5) the failure to act caused harm to the prisoner. *See Farmer v. Brennan*, 511 U.S. 825, 834,

837 (1994); *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). The second, third, and fourth elements comprise "deliberate indifference" to an inmate's medical needs. *See id.* If *Kingsley* applies in the present circumstance, then a plaintiff would no longer need to prove deliberate indifference, but only knowledge of the relevant facts and an objectively unreasonable failure to act. *Cf. Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018) (extending *Kingsley* to medical care claims and announcing the following elements of that claim: "(i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries").

The Estate, however, takes the position that "the Court need not address this issue because [the Estate] has ample evidence to satisfy the subjective deliberate indifference standard under the pre-*Kingsley* state of the law." (ECF No. 185 at 32; *see also* ECF No. 187 at 30 n.4.) The Court takes the Estate at its word and therefore does not explore the effect of *Kingsley*, particularly because removing the subjective component from deliberate indifference in the medical context comes very close to creating a federal constitutional cause of action simply for medical negligence— something against which the Supreme Court has counseled. *See, e.g.*, *Estelle*, 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the

Eighth Amendment.").

Thus, to restate the standard of liability, the Estate must prove: (1) objectively, Walter had a serious illness or injury, (2) the defendant in question was aware of facts from which the inference could be drawn that Walter faced a substantial risk of serious harm, (3) the defendant subjectively drew the inference, but (4) the defendant did not act, and (5) the failure to act caused harm to Walter. *See Farmer*, 511 U.S. at 834, 837; *Estelle*, 429 U.S. at 104–05.

Here, all remaining Defendants concede the first element, although for summary judgment purposes only. (*See* ECF No. 167 at 18; ECF No. 170 at 14 n.8.) And, the remaining Defendants make no argument regarding the fifth element. Accordingly, the only matters currently at issue are the information each Defendant had available to him or her, the subjective inference each drew from that information, and whether each failed to act appropriately.

## C. Beicker, Martin, and Rankin

The Court first examines the arguments of a trio the Estate dubs the "Command Staff Defendants": Sheriff Beicker, Undersheriff Martin, and Commander Rankin.

### 1. Traditional Liability & Qualified Immunity

The Command Staff Defendants claim they are entitled to qualified immunity because, they say, no clearly established law put them on notice of their duty to do more than they did under these circumstances. (ECF No. 167 at 22–24; ECF No. 192 at 15–16.)

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or

constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (internal quotation marks omitted). "The judges of the district courts . . . [may] exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The plaintiff bears the burden of demonstrating that the law was clearly established at the relevant time. *Lybrook v. Members of Farmington Mun. Sch. Bd. of Educ.*, 232 F.3d 1334, 1337 (10th Cir. 2000). "A right is clearly established in this circuit when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (internal quotation marks omitted). Nonetheless, the clearly established prong

> involves more than a scavenger hunt for prior cases with precisely the same facts. The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation. The Supreme Court has cautioned [lower] courts not to define clearly established law at a high level of generality, but to focus on whether the violative nature of particular conduct is clearly established.

*Perea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016) (internal quotation marks and citations omitted).

The Command Staff Defendants claim they repeatedly voiced their concerns to the CHC medical staff about Walter's worsening condition, but they were told that the medical staff had the situation in hand. The Command Staff Defendants further claim that no clearly established law required them to disregard the medical staff's

assurances.  They claim, to the contrary, that the opposite proposition is clearly established in the case law, *i.e.*, that they *may* rely on the medical staff's judgment. (ECF No. 167 at 22–24.)  If so, then they did not behave with deliberate indifference because they took the only step the law requires them to take—they sought advice from a medical professional.

But the case law on which the Command Staff Defendants rely is to the contrary. Indeed, no case cited by the Command Staff Defendants (and none of the additional cases cited by the Estate) discusses prison officials' reliance on medical professionals' judgment in absolute terms.  To the contrary, every decision qualifies such reliance, usually by stating that it must be *reasonable*.[3]  And in 2009, the Tenth Circuit declared, "[I]t has been clearly established for over a decade that unreasonable reliance on the advice of a medical professional will not excuse deliberate indifference to a prisoner's serious medical needs."  *Weatherford ex rel. Thompson v. Taylor*, 347 F. App'x 400, 404 (10th Cir. 2009).[4]

---

[3] *See Arocho v. Nafziger*, 367 F. App'x 942, 956 (10th Cir. 2010) ("The complaint bespeaks nothing more than a warden's reasonable reliance on the judgment of prison medical staff, which *negates* rather than supports liability." (emphasis in original)); *Hollis v. Davis*, 2014 WL 7184406, at *6 (N.D. Okla. Dec. 16, 2014) ("the reasonable reliance of jail officials on the medical advice of their contract partners would not necessarily be deliberate indifference"); *Key v. McLaughlin*, 2013 WL 1507950, at *5 (D. Colo. Mar. 19, 2013) (explaining that "[a] correctional officer is generally entitled to rely upon the advice and course of treatment prescribed by medical personnel" and citing cases that require such reliance to be reasonable), *report and recommendation adopted*, 2013 WL 1509478 (D. Colo. Apr. 12, 2013); *Fresquez v. Baldwin*, 2009 WL 2514414, at *2 (D. Colo. Aug. 13, 2009) ("Although it is true that in the normal case non-medical jail staff may rely upon the medical judgments of the medical professionals, it is also true that this is not so in the unusual case where it would be evident to the layperson that a prisoner is receiving inadequate or inappropriate treatment." (internal quotation marks omitted)); *Anglin v. City of Aspen, Colo.*, 552 F. Supp. 2d 1205, 1225 n.4 (D. Colo. 2008) ("As a non-medical professional, a reasonable law enforcement officer cannot be expected to question the judgment of qualified medical professional absent some extraordinary circumstances, the nature of which the court cannot even conjecture at this point.").

[4] This decision is not precedential and, as support for its declaration, it cites three extra-

But, the Command Staff Defendants argue, this statement of the law is too "generalized" to clearly establish their obligations in the present circumstance. (ECF No. 192 at 15–16.) "Here, [the Estate] fails to identify a single case where an officer(s) acting under circumstances similar to those faced by the command staff defendants was held to have violated the Fourteenth Amendment in a deliberate indifference case." (*Id.* at 16.)

The Court is keenly aware of the Supreme Court's recent emphasis on defining clearly established rights with specificity. *See, e.g.*, *White v. Pauly*, 137 S. Ct. 548, 552 (2017). Nearly all of these recent Supreme Court decisions, however, have arisen from allegations of excessive force under the Fourth Amendment. Just last month, the Supreme Court acknowledged just how fact-dependent that particular kind of case tends to be, thus compelling a finding of qualified immunity in many circumstances. *See Kisela v. Hughes*, 138 S. Ct. 1148, 1152–53 (2018). In the Court's view, this acknowledgement at a minimum urges caution by the district courts of simply assuming the broadest application of *White* and similar per curiam reversals outside the context of excessive force cases brought under the Fourth Amendment.

In any event, qualified immunity does not demand an absurd level of specificity. *See Sanchez v. Hartley*, ___ F. Supp. 3d ___, ___, 2017 WL 4838738, at *22 (D. Colo. Oct. 26, 2017). Here, viewing the facts in the light most favorable to the Estate (and many of these facts are undisputed anyway), the Command Staff Defendants were fully aware of, and at times personally witnessed, Walter's descent into madness, leading to

_____

circuit cases. *See id.* Thus, one could dispute (a) whether the Tenth Circuit appropriately applied its own precedent on how to discern what has been clearly established, and (b) whether the decision itself, being non-precedential, can clearly establish the law. But the Command Staff Defendants do not raise these arguments, so the Court will not address them further.

self-inflicted injuries and self-starvation.  Numerous laypersons, including Detention Center guards and inmates, believed that Walter obviously needed hospitalization.  In other words, a fact dispute prevents summary judgment in favor of the Command Staff Defendants on qualified immunity.

Moreover, it bears noting that if the Estate's version of the facts is believed—and a reasonable jury could believe it—then the doctrine of qualified immunity does not require the Estate to further pursue the "scavenger hunt" for a case with facts not just similar but—as these Defendants would have it—nearly identical to the facts presented here in order to establish that the Command Staff Defendants could not reasonably defer to medical personnel in such circumstances.  *See Perea*, 817 F.3d at 1204 ("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.").  This, the Constitution does not require.

The Court also rejects the Command Staff Defendants' argument that they cannot be liable unless they specifically understood that benzodiazepine withdrawal was the cause of Walter's symptoms.  (*See* ECF No. 167 at 24–25; ECF No. 192 at 14–15.)  The Command Staff Defendants' only support for this proposition is *Estate of Hocker by Hocker v. Walsh*, 22 F.3d 995 (10th Cir. 1994), where the decedent had been admitted to the county jail while intoxicated and, about thirty-six hours later, committed suicide in her cell.  *Id.* at 996–97.  The Tenth Circuit affirmed summary judgment for the defendants because they had no knowledge, or reason to know, of the "specific risk" of suicide.  *Id.* at 1000.  The Command Staff Defendants argue that they, likewise, did not have actual knowledge, or reason to know, of "'the specific risk' in question—here, the

risk posed by Klonopin withdrawal." (ECF No. 167 at 25.) But the facts and legal theories in *Estate of Hocker* are quite different to those presented here, and the argument is otherwise meritless.

The Court is aware of no case law—and the Command Staff Defendants cite none—stating that prison officials must understand *why* an inmate is displaying certain symptoms before they can be held liable for not trying to obtain care. If prison officials come across an inmate bleeding profusely from some sort of wound, their duty to seek medical help does not depend on identifying the cause of the wound.[5] Ordinary laypersons know that profuse bleeding may be life-threatening, and for that reason alone the prison officials have a duty to act. So too here: prison officials did not need to understand the cause of Walter's symptoms to understand that his condition was dire.

For all of these reasons, the Command Staff Defendants are not entitled to summary judgment, on qualified immunity grounds or otherwise, with respect to their potential individual liability.

2.   Supervisory Liability

The Estate further claims it can prove its case against the Command Staff Defendants on a supervisory liability theory. The basic elements of supervisory liability are: "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation." *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir.

---

[5] If the claim is that prison officials knew ahead of time that someone was likely to attack the inmate, then *Estate of Hocker*'s emphasis on knowledge of the "specific risk" would become relevant. *See Farmer*, 511 U.S. at 834, 837. But such knowledge is irrelevant with regard to medical care after the attack has happened.

2010).[6]

At least for summary judgment purposes, the Command Staff Defendants do not dispute that they had the relevant policymaking authority. (*See* ECF No. 187 at 5, ¶ 1.) In this light, the Estate claims that the Command Staff Defendants were responsible for the Detention Center policy that prohibited sending inmates to the hospital without medical staff approval, except in cases of nonresponsiveness or conditions like severe bleeding. The Estate claims that this policy prevented the Command Staff Defendants' subordinates from acting on their own wishes to send Walter to the hospital, and Walter died as a result. (ECF No. 187 at 34.)

The Command Staff Defendants counter that the Estate "cannot establish that any 'hospitalization' policy caused Mr. Walter's death." (ECF No. 192 at 17.) But the Command Staff Defendants do not argue that Walter would have died anyway had he been sent to the hospital, and there is evidence from which a reasonable jury could conclude that Detention Center guards would have called an ambulance but for the Detention Center policy against it. Thus, summary judgment is not warranted on causation.

The Command Staff Defendants further counter that the Estate cannot establish that they "acted with the state of mind required to establish a deliberate indifference claim." (*Id.*) By this, the Command Staff Defendants mean to say that the Estate

---

[6] The Supreme Court has deemed the term "supervisory liability" to be "a misnomer" to the extent it implies pure vicarious (*respondeat superior*) liability. *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). With the understanding that Defendants certainly "do not answer for the torts of their [subordinates]" and may only be "liable for [their] own misconduct," *id.*, this Court will continue to refer to "supervisory liability" as a convenient and already-established shorthand for the concept that government officials who did not personally come into contact with a plaintiff may still be liable, in certain circumstances, for constitutional violations effected by the actions of those who did come into contact with the plaintiff.

cannot prove that the policy "was itself the product of deliberate indifference." (*Id.* at 20.)

The Command Staff Defendants are correct that supervisory liability based on a policy requires the Estate to establish that the policymaker acted with deliberate indifference at the time the policy was promulgated. *See, e.g.*, *Roe v. Elyea*, 631 F.3d 843, 862 (7th Cir. 2011) ("[the plaintiff] presented sufficient evidence from which a jury could conclude that [the defendant] acted with a sufficiently culpable state of mind in setting the [prison system] policy that resulted in a denial of the treatment recommended [for the plaintiff]"). The Estate does not explain how it intends to prove as much. But, for essentially practical reasons, the Court finds summary judgment inappropriate.

To begin, it is unclear whether the Estate is attacking the promulgation of the policy or the fact that the Command Staff Defendants did not suspend or waive it under the circumstances. *Cf. Johnson v. Wright*, 412 F.3d 398, 403–06 (2d Cir. 2005) (holding that a trial was necessary to determine whether senior prison officials were deliberately indifferent in enforcing a medical policy that denied treatment to inmates in certain circumstances). If the latter is the Estate's theory, it is similarly unclear if it is a true supervisory liability theory, as opposed to a traditional individual liability theory. Moreover, if the Court were to grant summary judgment to the Command Staff Defendants on this theory, it would change essentially nothing in the upcoming trial, except perhaps whether to approve a jury instruction on supervisory liability. But the Court believes that decision should be made at the charging conference, which will follow the close of evidence. At that point, the Court will have a full record of what the

Estate intends to prove and the evidence it put on to prove it.

In short, the case against the Command Staff Defendants will go to trial no matter how the Court rules on the specific question of supervisory liability, and that trial will look almost exactly the same regardless—the Court can see no way that the Estate's presentation of evidence would be materially affected by such a ruling. Thus, summary judgment solely on the question of supervisory liability is inappropriate on the current record.

## D. Fremont County

The Estate seeks to hold Fremont County itself liable through the doctrine first announced in *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *Monell* held that a municipality can be liable for damages under 42 U.S.C. § 1983 only when the entity's "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [constitutional] injury." *Id.* at 694.

Fremont County argues, "[T]here is no evidence that any policy or custom of Fremont County was the moving force behind, or caused or enabled, Mr. Walter's death." (ECF No. 167 at 36.) The County also argues, "There is . . . no evidence that Fremont County was on notice, prior to Mr. Walter's death, that any policies or procedures of [CHC] were causing problems of the sort alleged here." (*Id.*) It is undisputed, however, that CHC was a final policymaker for the County with regard to Detention Center healthcare. (*See* Part II.A, above.) The Estate therefore argues that CHC's policies—including its unwritten but acknowledged "no benzo" policy (*see* Part II.C.1, above)—became the County's policies through the "non-delegable duty doctrine,"

which essentially holds that the government cannot avoid § 1983 liability by contracting out its constitutional duties to a third party. (*See* ECF No. 187 at 34–35.)

Apparently the Tenth Circuit has never decided whether to adopt the non-delegable duty doctrine. The Court is nonetheless persuaded by the decisions of many other courts that the doctrine is correct (*see id.* at 34–37 & n.6 (citing numerous cases)), at least where, as here, the government delegates final policymaking authority to the third party. *See, e.g.*, *King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012) ("The underlying rationale is not based on *responde[a]t superior*, but rather on the fact that the private company's policy becomes that of the County if the County delegates final decision-making authority to it."). Thus, CHC's policies became the County's policies. And there is a genuine dispute of material fact over whether CHC's "no benzo" policy was a moving force behind Walter's death. For these reasons, the question is not whether the County itself promulgated an unconstitutional policy or had notice of problems caused by CHC's policy, but whether CHC had an unconstitutional policy and otherwise satisfies the *Monell* requirements. If it does, the County can be liable because CHC stepped into the County's shoes with the County's permission.

Fremont County further argues that the Estate has not presented evidence that any policy attributed to the County "was itself the product of deliberate indifference." (ECF No. 167 at 36.) Although an arguable point, the Tenth Circuit holds that deliberate indifference is a required element of every form of *Monell* liability (*e.g.*, express policy, widespread custom, failure to train, etc.). *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769, 771 n.5 (10th Cir. 2013); *see also Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (describing the many subspecies of

*Monell* liability).

> The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. In most instances, notice can be established by proving the existence of a pattern of tortious conduct. In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior if a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction, such as when a municipality fails to train an employee in specific skills needed to handle recurring situations, thus presenting an obvious potential for constitutional violations.

*Barney v. Pulsipher*, 143 F.3d 1299, 1307–08 (10th Cir. 1998) (citations and internal quotation marks omitted).

Here, a genuine factual dispute exists over whether CHC's decisionmakers must have known from the outset that a "no benzo" policy which did not allow for gradual tapering would likely lead to severe symptoms and potentially death. (*See* Part II.B, above.) The Court thus may not grant summary judgment against the Estate on its *Monell* claim derived from CHC's policies.[7]

## E.    Allen and Repshire

The Court now turns to the two CHC-affiliated defendants who have moved for

---

[7] The Estate asserts additional *Monell* theories, including: (1) the acts of final policymakers such as the Command Staff Defendants are imputed to the County, so the Command Staff Defendants' allegedly unconstitutional actions may be deemed to be the County's actions (ECF No. 187 at 39); (2) the Detention Center's policy strictly limiting the circumstances in which Detention Center guards could call an ambulance contributed to Walter's death (*id.* at 39–40); and (3) the County ratified the Detention Center's allegedly unconstitutional treatment of Walter because Sheriff Beicker is a final policymaker for the County and his actions amounted to ratification of the Detention Center's conduct (*id.* at 40). The County does not respond to the first of these arguments. As to the second and third, the County's responses raise factual questions that a reasonable jury could resolve either way. (*See* ECF No. 192 at 19–20.) Thus, summary judgment is likewise inappropriate on these alternative *Monell* theories.

summary judgment, Dr. Allen and Nurse Repshire. They do not assert a qualified immunity defense. The Court accordingly need not decide whether employees of private companies providing medical services to inmates may assert that defense. *Cf. Estate of Grubbs v. Weld Cnty. Sheriff's Office*, 2017 WL 951149, at *5–6 (D. Colo. Mar. 8, 2017) (surveying the law on this question and concluding that qualified immunity is unavailable). The only question as to these two defendants is whether the Estate has enough evidence from which a jury could infer the subjective state of mind required for liability.

      1.   <u>Repshire</u>

Nurse Repshire argues that the Estate cannot prove her subjective deliberate indifference because she was not adequately trained regarding the symptoms and possible dangers of benzodiazepine withdrawal, and in any event she sought advice from more-senior medical authorities such as PA Havens and Dr. Herr. (ECF No. 170 at 18–19.)[8] In other words, she says, her undisputed actions show that she was trying to get Walter the care he needed.

The Estate responds that Repshire's knowledge regarding benzodiazepines, and the extent of her advice-seeking, if it happened at all, is disputed. (ECF No. 185 at 37–38.) Moreover, says the Estate, Repshire watched Walter gradually deteriorate over the last few days of his life to the point where any layperson would understand that Walter needed hospitalization, yet Repshire did nothing. (*Id.* at 36–37.)

"[A] factfinder may conclude that a prison official knew of a substantial risk [of harm to an inmate] from the very fact that the risk was obvious." *Farmer*, 511 U.S. at

---

[8] Repshire also claims that she ensured that Dr. Allen would visit Walter, but Repshire does not cite any support in the record for that claim. (*See* ECF No. 170 at 6, ¶ 14.)

842.  Looking at the evidence in the light most favorable to the Estate, a reasonable jury could infer that Repshire subjectively understood the risk of not seeking outside help for Walter.  The Court therefore may not grant summary judgment in Repshire's favor.

       2.    <u>Allen</u>

Dr. Allen argues that the Estate's case against her amounts to, at best, medical negligence, which does not state a constitutional violation.  (ECF No. 170 at 20–24.) *See also Estelle*, 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").  Allen emphasizes that, in her ten-minute examination, she considered benzodiazepine withdrawal but instead diagnosed bipolar disorder and wrote a prescription based on that diagnosis. (*See id.*)  If this diagnosis was incorrect, she argues, then the Estate can prevail against her only if it can prove that she "treated Mr. Walter for a bipolar disorder, while simultaneously believing that he was really suffering from life-threatening withdrawal." (ECF No. 201 at 29.)

The Estate's burden is not quite that stark or so narrowly focused.  The subjective deliberate indifference standard requires the Estate to prove that Dr. Allen "acted or failed to act despite [her] knowledge of a *substantial risk* of serious harm." *Farmer*, 511 U.S. at 842 (emphasis added).  Applied to this case, the Estate could prevail by convincing a jury, for example, that Allen subjectively believed there was *a substantial risk* that Walter was facing a threat more severe than bipolar disorder.

The Court agrees with Allen that this will be a difficult task, but the Estate's view of the evidence is not beyond what a reasonable jury could accept.  If the Estate's evidence is believed, then Allen met for only ten minutes with a man who was naked,

visibly injured and wasting away, who did not know where or when he was, who could barely answer very basic questions, and who was no longer eating or sleeping regularly. Assuming a jury believes the Estate's argument that all of Walter's symptoms were consistent with benzodiazepine withdrawal, and assuming a jury accepts the Estate's argument that Allen is fabricating the conversation with Nurse Maestas about Walter's supposed noncompliance with his Klonopin prescription before entering the jail (*see* Part II.C.7, above), a jury could reasonably find that Allen subjectively harbored substantial doubt about her bipolar diagnosis. Summary judgment for Allen is therefore inappropriate.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. The Fremont County Defendants' Motion for Summary Judgment (ECF No. 167) is DENIED;

2. The Joint Motion for Summary Judgment on All Claims Against Stephanie Repshire and Sharon Allen, M.D. (ECF No. 170) is DENIED; and

3. This matter REMAINS SET for a Final Trial Preparation Conference on November 13, 2018 at 2:00 PM, and a 17-day jury trial to commence on November 19, 2018 at 8:30 AM, both in Courtroom A801.

Dated this 29th day of May, 2018.

BY THE COURT:

William J. Martinez
United States District Judge